## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

DEBORAH ELLEN FURLO,

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

_____/

CASE NO. 1:14-cv-14392

DISTRICT JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGEMENT
(Docs. 13, 17)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Doc. 13) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 17) be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 2; Transcript, Doc. 10, at 74) The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 17.)

Plaintiff Deborah Furlo was 50 years old at the most recent administrative hearing. (Tr. 19, 32.) On June 28, 2012, Plaintiff filed the present claim for SSI, alleging that she became unable to work on June 19, 2012 when she was 49 years old. (Tr. 119.) Plaintiff's only work within the last fifteen years was as a housekeeper in 1998. (Tr. 136.)

The claim was denied at the initial administrative stage. (Tr. 74.) On July 30, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Joy Turner, who considered the application for benefits *de novo*. (Tr. 28-62.) In her decision, issued on August 16, 2013, the ALJ found that Plaintiff was not disabled. (Tr. 23.) Plaintiff requested a review of this decision. (Tr. 9.)

The ALJ's decision became the Commissioner's final decision on September 16, 2014, when the Appeals council denied Plaintiff's request for review. (Tr. 1.); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004). On November 14, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl's compl., Doc. 1.)

**B.    Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical

or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five step analysis, the ALJ found Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 19, 2012. (Tr. 49.) At Step Two, the ALJ found Plaintiff had the following severe impairments: "affect disorder and joint pain." (*Id.*) At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations (Tr. 50.) The ALJ then found that Furlo had the residual functional capacity ("RFC") to perform light work "except she must avoid extreme vibration and limit the use of her upper extremities to frequent as opposed to constant. Also, the claimant is limited to performing simple routine tasks with no interaction with the public and only occasional interaction with co-workers and supervisors." (Tr. 52.) At Step Four, the ALJ found that Plaintiff is capable of performing her past relevant work as a cleaner. (Tr. 55.) In the alternative, the ALJ found, at Step Five, that a significant number of jobs existed which Plaintiff could perform despite her limitations. (*Id.*) The ALJ also found that Plaintiff was 49 and therefore a younger individual (age 18-49) on the alleged onset date. (*Id.*) As a result, the ALJ found Plaintiff is not disabled under the Act. (Tr. 56.)

### E.    Administrative Record

#### 1.    *Medical Records*

Plaintiff was primarily treated by nurse practitioner Barbara Kish for joint pain, hepatitis C, and depression. (Tr. 198-99, 281-89.) She was treated by the emergency care center of Covenant Healthcare on three occasions, (Tr. 233-59), and underwent three consultative examinations, including a state psychological exams, and a state medical exam.

5

(Tr. 205, 210, 261.) A mental residual functional capacity assessment was also completed by a Department of Disability Service Consultant. (Tr. 69.)

Prior to the alleged onset date of June 2012, Plaintiff was diagnosed with Hepatitis C.[1] (Tr. 205, 210.) Plaintiff also reported, during consultative examinations that she was diagnosed with arthritis of the neck and hands[2] as well as depression. (Tr. 205-06, 210-11.) On February 4, 2011, Plaintiff visited the emergency department of Covenant Healthcare for a headache, a fever, a cough, and nasal drainage. (Tr. 234.) Upon examination Furlo's neck was noted to be "[s]upple with no cervical lymphadenopathy and no nuchal rigidity." (*Id.*) After a CT scan, Furlo was diagnosed with acute sinusitis. (Tr. 235.) On April 22, 2011, nurse practitioner Kish completed a physical exam of Plaintiff and diagnosed arthralgias of the hands. (Tr. 198.) On April 15, 2011, Ms. Kish noted Plaintiff had pain in her neck and knuckles that had been ongoing for two weeks. (Tr. 199.) Ms. Kish advised Furlo to have an MRI of her liver for her Hepatitis C. (*Id.*)

Subsequent to the alleged onset date, on August 30, 2012, Plaintiff was sent for a psychological consultative examination with Nathalie Menendes, Psy.D. (Tr. 205.) Dr. Menendes noted that Plaintiff has a family history of depression, and "was psychiatrically hospitalized about two years ago after a suicide attempt." (Tr. 205.) She also noted that Plaintiff has a history of alcohol, heroin, cocaine, and prescription medication abuse, but has not used substances in about five years. (Tr. 205-06.) Plaintiff complained that she feels

---

[1] The record is unclear as to precisely when Plaintiff was diagnosed, but it appears to have been 7-15 years prior to the alleged onset date. (Tr. 141, 205, 210, 261.)

[2] During a consultative medical exam of Plaintiff in October 2013, Dr. Sankaran noted that plaintiff reported that "[s]he could not move her neck about two years ago. She went to the emergency room at Covenant Health Center and they did an X-ray and told her she had arthritis in the neck. She also had X-ray of the hands and was told she might have early degenerative arthritis." (Tr. 210-11.)

"'down and out,'" sleeps a lot, has a poor appetite, is often irritated, has some suicidal ideation, feels hopeless and helpless, does not socialize much, has poor motivation, has low energy levels, and has difficulty concentrating. (Tr. 205.) Furlo also shared that "she does not sleep well because the pain and numbness in her hands wakes her up." (Tr. 206.)

With regard to attitude and behavior, Dr. Menendes found that Furlo had good contact with reality, fair insight, low motivation, and normal motor activity. (Tr. 207.) She noted that Furlo "is able to function independently" and "did not appear to exaggerate or minimize her symptoms." (*Id.*) Dr. Menendes conducted tests inquiring into memory, information, calculations, abstract thinking, and judgment. (Tr. 207-08.) Dr. Menendes concluded that plaintiff

> is able to perform and remember concrete, repetitive, and tangible tasks such as activities of daily living and housekeeping duties. . . . She likely has the capability to perform complex or multi-step tasks, make independent work related decisions, and engage in abstract thinking and work that is not routine. However, her symptoms of depression will interfere with her ability to perform any job duty, simple or complex, on a consistent and reliable basis. Further, she would likely not handle frustrating situations well and should not be expected to be able to cope with stress or difficult situations in the work setting. Her social skills are adequate and she should be able to interact appropriately with others.

(Tr. 208.) Dr. Menendes noted a GAF score of 46, diagnosed moderate to severe major depressive disorder, and diagnosed polysubstance dependence disorder, in full sustained remission. (*Id.*)

On October 3, 2012, a state medical exam was conducted by Siva Sankaran, MD. (Tr. 210.) Dr. Sankaran noted that Plaintiff "feels tired and fatigued all the time," but is not currently on medication nor suicidal/homicidal. (*Id.*) Plaintiff complained of pain in her neck, and reported no current Hepatitis C issues. (Doc. 210-11.) Dr. Sankaran noted that Furlo was

an alcoholic and "still drinks a couple glasses of vodka twice a week." (Tr. 211.) Upon examination, Dr. Sankaran found that Plaintiff has a 40-pound grip strength,[3] negative Tinel's and Phalen's signs, and "is able to open a jar, button clothing, write legibly, pick up a coin and tie shoelaces with either hand." (Tr. 212.) Dr. Sankaran found mild tenderness in Plaintiff's neck, but no muscle spasms and a normal range of motion. (*Id.*) Plaintiff had perfect range of motion on tests of her cervical spine, lumbar spine, knees, hands, and fingers. (Tr. 216-17.) Dr. Sankaran concluded that Plaintiff had no limitation of motion in the neck and "no arthritis of the hands with good intact grip." (Tr. 211-12.)

On October 22, 2012, Plaintiff saw Ms. Kish complaining of "numbness in hands [that] feels like pens [sic] and needles."[4] (Tr. 219.) Upon examination, Ms. Kish noted Furlo's hand joints were swollen and presented with "Hberdens noeds at DIP joints" bilaterally. (Tr. 221.) Plaintiff was "oriented to time, place, and person," and "no depression, anxiety or agitation" was noted. Ms. Kish assessed Furlo with bilateral carpal tunnel syndrome. (Tr. 221-22.)

On September 4, 2012, Bruce Douglass, Ph.D completed a mental residual functional capacity assessment on behalf of the state. (Tr. 69-71.) He opined that plaintiff was markedly limited in her ability to interact appropriately with the general public, and moderately limited in several areas including her ability to understand, remember, and carry out detailed instructions. (Tr. 70-71.) He explained that her "[m]emory and understanding are globally intact, with mild focal deficits," and concluded that she "retains the capacity to perform

---

[3] Plaintiff notes in her brief that Dr. Sankaran appears to have administered a Jamar test which is "[a] type of grip strength testing device called a dynamometer." (Doc. 13, at 346.) "Dynamometer testing is typically performed in sets of three tries on the left and three tries on the right and recorded either in pounds or kilograms." (*Id.*) However, these results are not included in Dr. Sankaran's records.

[4] Ms. Kish wrote, "She has a history of Rheumatoid arthritis (?)" (Tr. 219.)

routine, 2-step tasks on a sustained basis." (*Id.*) He opined that her "[c]oncentration, pace and persistence are mildly/moderately impaired, and workplace performance will vary with mood and/or distractibility in demanding work settings." (Tr. 71.) Finally he opined that Furlo's "[s]ocial functioning is moderately restricted, and [Plaintiff] might not work will with the public. She will work best alone or in small, familiar groups without significant contact with the public. Self care is intact." (Tr. 71.)

On November 21, 2012, Plaintiff's rheumatoid factor testing was positive, and Ms. Kish referred her to a rheumatologist. (Tr. 223.) Ms. Kish also noted the presence of a hemangioma on Plaintiff's liver ultrasound that had been "there for a while." (*Id.*) Upon examination, she noted "enlarged DIP joints" bilaterally and diagnosed plaintiff with rheumatoid arthritis and liver mass-hemangioma. (Tr. 224-25.)

On January 11, 2013, Plaintiff complained to nurse practitioner Kish that she was "very stressed [and] would like something to help her." (Tr. 226.) Furlo had swelling in both hands and multiple skin lesions; she assessed the hand pain as 4 out of 5 and described it as sharp and intermittent. (*Id.*) Ms. Kish examined Plaintiff's neck noting that it was "supple without lymphadenopathy, no messes, trachea midline, [and] no nuchal rigidity." (Tr. 228.) She noted bilateral upper extremities "with hypertrophied swollen joints." (Tr. 229.) Ms. Kish diagnosed plaintiff with anxiety and rheumatoid arthritis. (*Id.*)

On January 21, 2013, Plaintiff told emergency medical services dispatched to her home that "she is depressed and would 'hang herself if she could.'" (Tr. 256.) Plaintiff's boyfriend reported she had been drinking that day and abusing medications that were recently prescribed to her. (*Id.*) Plaintiff was admitted to the emergency department with "multiple

complaints including generalized fatigue, frequent falls and generalized pain." (Tr. 239.) She also complained of severe arthritis pain and requested anxiety medication. (*Id.*) A physical exam revealed that Plaintiff appeared anxious and had normal range of musculoskeletal motion, "[n]o swelling, tenderness or ecchymosis of the bilateral lower extremity," and "normal strength and sensation of bilateral upper and lower extremity." (Tr. 240.) A urine drug screen was positive for benzodiazepine and cocaine. (*Id.*) She was diagnosed with acute alcohol intoxication, acute generalized malaise, acute generalized pain, and acute cocaine abuse. (Tr. 241.) Jonathon Deibel, M.D. spoke with plaintiff regarding alcohol and drug usage, and she denied "the service of crisis." (Tr. 240-41). Upon reevaluation, Dr. Deibel reported that Plaintiff had left the emergency department. (Tr. 241.)

On January 25, 2013, emergency medical services found Plaintiff "sitting on the bed in an obvious state of intoxication and depression." (Tr. 259.) She was treated in the emergency department for alcohol intoxication and suicidal thoughts. (Tr. 247.) A urine drug screen was positive for cocaine, and her blood alcohol level was .27%. (Tr. 249.) She was held for evaluation by crisis, at which time she denied suicidal or homicidal ideation. (*Id.*) She admitted to drug and cocaine usage and stated that she was upset and "made comments that she did not mean." (*Id.*)

On February 11, 2013, during a follow up to her emergency room visit, nurse practitioner Kish "counselled [Furlo] that she will no[t] receive any narcotics because she is using cocaine intermittently." (Tr. 286.) Plaintiff asked to start medication for depression "due to her poor living circumstances." (*Id.*) Plaintiff weighed 117 pounds. (*Id.*) Ms. Kish diagnosed Plaintiff with depression and prescribed celexa and tramadol. (Tr. 288-89.)

On April 10, 2013, nurse practitioner Kish noted that Furlo wants treatment for hepatitis C but drinks alcohol. (Tr. 282). Plaintiff weighed 113 pounds and had a normal body mass index. (*Id.*) Ms. Kish completed a physical exam, noting that Plaintiff's neck "was supple without lymphadenopathy, no masses, trachea midline, [and] no nuchal rigidity." (Tr. 282.) She also noted that Furlo was oriented to time place and person, and had no depression anxiety or agitation. (Tr. 284.) Ms. Kish did not complete a musculoskeletal exam. (*Id.*)

Plaintiff saw Rheumatologist, Albert Manlapit, M.D. on April 18, 2013. (Tr. 261.) After describing Furlo's medical history, he reviewed her systems noting that "[s]he denies any weight loss, anorexia, fever, or chills though there is some fatiguability [sic]." (*Id.*) He noted "occasional bluish color changes to the fingers when exposed to the cold," and "no extra-articular features of a sero-negative spondyloarthropathy." (*Id.*). During a physical examination, Dr. Manlapit made the following findings:

> Examination reveals a Caucasian female, not in acute distress. Weight is 106 pounds. There is adequate cervical spine and shoulder ROM without irritability of the rotator cuffs. Elbows are benign. There are bony changes in the DIP's more than the PIP's. There is minimal thickening and distinct tenderness in MCP #2 bilaterally on the right more than the left. There is less thickening in MCP #1 on the right. Both wrists are slightly irritable on extension with tenderness on the right more than the left. On the right side, there is slight excessive heat. Wrist extension is 60 degrees and flexion is 75 degrees. Hips, knees, and ankles are benign. There is bony change in the left midfoot dorsum. MTP's and toes are benign. There is no rash or palpable purpura. Exaggerated kyphosis of the thoracic segment is noted. Lungs are clear to auscultation.

(Tr. 262.) Thereafter, Dr. Manlapit reached the following diagnosis:

> Mild Mixed Cryoglobulinemia associated with inflammatory type arthralgia's and paresthesias but without any renal involvement, palpable pupura, or hepatic involvement. Her HCV RNA quantitative count reveals more than 9,000,000 copies with a top normal of less than 43. RF is positive. There is associated

polyclonal hypergammaglobulinemia on SPEP. She has no distinct features of Rheumatoid Arthritis and her CCP antibody is negative.

(*Id.*) Due to the absence of major manifestations he found "no indication for the use of IV steroids, Cyclophosphamide, or Rituxan." (*Id.*) He noted that nurse practitioner Kish should determine if an interrupted antiviral regimen should be completed. (*Id.*)

On May 14, 2013, nurse practitioner Kish treated Plaintiff for cold symptoms. (Tr. 275.) A physical exam revealed the same results as the exam completed in April; however Furlo weighed only 107 pounds. (Tr. 275, 278). Ms. Kish diagnosed Furlo with an upper respiratory infection, hypertension, and a "body mass index less than 19 Adult." (Tr. 278.)

### 2. *Function Reports*

Furlo completed a function report on July 31, 2012. She reported that she lives with a friend in a motel and spends most of her time laying down and sleeping during the day. (Tr. 149-50.) She wrote that her ability to work is limited by her depression; a disc problem in her neck; her hands, which are numb and have little grip strength; and her hepatitis, which keeps her "severely fatigued, nauseous, [and] unable to do anything." (Tr. 149.) She does not have a driver's license, and reported that she could not drive because of dizziness. (Tr. 150.) She does not prepare meals, because she is homeless and does not have a stove. (Tr. 151.) She does laundry at her sister's home, has no problems with personal care, takes walks in the summer, can go out alone, goes grocery shopping once a week, talks with family daily, and could pay bills if she had any accounts. (Tr. 150-53.) Her only hobby is watching television, and she does not go anywhere. (Tr. 153.) She has problems getting along with others because she "can get really moody and argumentative." (Tr. 154.) When asked to select from a list the activities that

12

her condition has effected, such as squatting, memory, and seeing, she checked off every item except hearing and talking. (*Id.*) She wrote that she follows written instructions fairly well and wrote "No way!" when asked how well she follows spoken instructions. (*Id.*) She also reported that she doesn't handle stress or changes to her routine well. (Tr. 155.) Finally, she reported that she should be on medication but does not have insurance. (Tr. 156.)

Furlo's sister Sharon Buppis completed a third party function report on July 31, 2012. (Tr. 141.) Ms. Buppis largely corroborates Furlo's report, except she reported that Furlo goes out "[p]retty much daily when it's nice out." (Tr. 144.) She also checked off fewer limitations, reporting that Furlo's impairments did not affect her ability to squat, kneel, talk, hear, and understand. (Tr. 146.)

### 3.   *Hearing*

Plaintiff was represented by counsel, during the hearing before the ALJ, on July 30, 2013. (Tr. 30.) With regard to her personal life, she testified that she divorced her husband because of physical abuse, and currently lives in a duplex with her boyfriend and his father. (Tr. 33, 47-48.) She has two children, ages 25 and 23, from her marriage. (Tr. 33, 47.) Furlo's highest education is the 11th grade. (Tr. 34.) She does not currently have a driver's license and relies on family for transportation. (*Id.*)

Furlo testified that she has not worked anywhere since the alleged onset date. (Tr. 35.) She last worked full-time in 1988, cleaning rooms and doing laundry at a motel. (Tr. 35-36.). She could not recall how long she worked there, but stated that "[i]t lasted a while." (Tr. 36.)

With regard to mental health, Plaintiff explained that she is very depressed, frequently cries, has no energy, cannot concentrate, and is not interested by anything. (Tr. 37.) She stated,

"Some mornings I wake up and I don't even know why I wake up. It's like I have no purpose." (*Id.*) Furlo admitted that her "occasional" cocaine usage and alcohol consumption, since January 2013, could "possibly" be contributing to her depression; however, she also testified that her depression may be worse when she is not drinking or using cocaine. (Tr. 38). She testified that she is not currently on antidepressant medication because it made her depression worse. (Tr. 41.) She also stated that she does not have friends, has lost interest in chores and cooking over the past year, does not do anything and does not leave the house except to go grocery shopping sometimes. (Tr. 42-44.) However, when pressed, she admitted to occasionally walking around the block or sitting outside in the summertime and watching about six hours of television every day. (*Id.*) Plaintiff further testified that on bad days she does not get dressed at all and stays in bed. (Tr. 44-45). She testified that she has not received sufficient treatment for depression or substance abuse because of insurance issues and that she hasn't tried to find any free clinics. (Tr. 37-38, 44-45.)

With regard to physical health, Furlo testified that she recently lost six or seven pounds but that she currently weighs 112 pounds, which is normal for her. (Tr. 33.) She testified that she is anemic and often throws up when she tries to eat because she gets nervous. (Tr. 37.) Furlo was diagnosed with hepatitis C "years and years ago," and has experienced ups and downs with the disease. (Tr. 50-51.) Plaintiff explained that nurse practitioner Kish wants to initiate hepatitis treatment, which is why she saw the rheumatologist, Dr. Manlapit. (Tr. 39.) However, Dr. Manlapit was opposed to the treatment because it would damage her liver. (Tr. 38-40.) She testified that she could lift and carry approximately 20-30 pounds, but that her arthritis causes her hands to go numb and she frequently drops things. (Tr. 40.) Furlo also

14

testified that she is "fidgety" and cannot sit more than twenty minutes, can stand for fifteen minutes, and walk for fifteen minutes. (Tr. 40-41.) She testified that she drinks a half-pint of vodka once maybe twice a week. (Tr. 55.) She also testified that she uses cocaine to help with pain but that it makes it worse. (Tr. 89.) Furlo also testified that she has arthritis in the back and in the neck, and that she was treated in the emergency room for severe neck pain. (Tr. 57).

Plaintiff presented her hands to the ALJ testifying that the swelling in her knuckles is "real bad" and has been there for a long time. (Tr. 49.) She testified that she does not understand why Dr. Sankaran noted that her hands were fine. (Tr. 49-50.) She stated that the examination Dr. Sankaran performed "seemed silly," explaining that "he checked like my eyes, my ears. He made me move my feet. And when he looked in my ears he said, your liver is fine." (Tr. 50.) She could not recall if he had her perform various tasks, such as tying laces and picking things up, but she estimated that the entire examination took only ten minutes. (*Id.*)

The Vocational Expert ("VE") testified that as performed, Plaintiff's past job as a cleaner, housekeeper is a strength level of medium, but under the *Dictionary of Occupational Titles* ("DOT") it is a strength level of light. (Tr. 59.) The ALJ asked the VE the following hypothetical:

> I'd like you to assume a hypothetical individual with the past jobs you described. Further assume this individual would be limited to light work. In addition, she would have to avoid extreme vibration and limit the use of her upper extremities to frequent as opposed to constant. She would be limited to simple, routine tasks with no interaction with the public, occasional interaction with co-workers and supervisors.

(Tr. 60.) The VE testified that according to the DOT such an individual could perform past work consistent with Plaintiff's. (*Id.*) He also stated that the hypothetical individual

could perform work as a collator operator, lining scrubber, and screen tacker, each of which has a strength of light. (Tr. 60-61.) With regard to the number of jobs, he testified that there are 225,310 national and 5,650 Michigan state jobs as a collator operator; 419,840 national and 17,940 Michigan state jobs as a lining scrubber; and 218,740 national and 14,470 Michigan state jobs as a screen tacker. (Tr. 60-61.) He stated that his testimony is consistent with the DOT but recommended that, based on his experience in the field, the number of lining scrubber positions be reduced by 75% because it is a highly specialized position. (Tr. 60-61.)

The ALJ next asked the VE to imagine a hypothetical individual with the impairments previously described who also "would not have the persistence, pace or concentration to perform work activities on an eight-hour day, five-day-a-week, 40-hour work week or equivalent schedule and would be absent three or more days a month due to impairments." (Tr. 61.) The VE testified that such an individual would be precluded from working. (Tr. 61-62.)

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the

Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §

404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be

disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment." 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)   [D]aily activities;

(ii)  The location, duration, frequency, and intensity of . . . pain;

19

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

**G.    Analysis**

**1.    *Whether the ALJ Erred by Finding Plaintiff's Rheumatoid Arthritis, Chronic Alcoholism, and Cocaine Abuse Are Not Severe Impairments.***

At Step Two, Plaintiff argues that the ALJ erred by not finding that Plaintiff's rheumatoid arthritis, chronic alcoholism, and cocaine abuse are severe impairments. (Doc. 13, at 17.) However, once the Step Two list of severe impairments is "cleared" by a finding that a severe impairment exists, "the ALJ must consider all impairments, severe and non-severe, in the remaining steps." *Anthony v. Astrue*, 266 Fed. Appx. 457, 457 (6th Cir. 2008); *Pompa v. Comm'r of Soc. Sec.*, 73 Fed. Appx. 801, 803 (6th Cir. 2003). "The fact that some of [the plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Astrue*, 266 Fed. Appx. at 457. Here, the ALJ found Plaintiff has the following severe impairments: "affective disorder and joint pain." (Tr. 16.) She considered Plaintiff's substance abuse and rheumatoid arthritis throughout the remaining steps. (Tr. 19-21.) Thus, Step Two was cleared and any error on the ALJ's part is legally irrelevant. Thus the ALJ did not commit reversible error in Step Two.

### 2. *Whether the ALJ Erred by Finding Plaintiff Did Not Meet or Equal Listings 1.02, 14.09, and 12.04.*

The ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 17.) Plaintiff contends that the ALJ's determination is not based upon substantial evidence because the record supports a finding that she meets the criteria of Listed Impairments 1.02, 14.09, and 12.04. (Doc. 13, at 18-20.)

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof. *See Sullivan v. Zebley*,

493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id.*; *see also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance " to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

The ALJ retains discretion at this stage, and does not need to attach any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the

22

administrative law judge or the Appeals Council must be received into the record as expert

opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

The ALJ's Step Three explanation is held to the same standard as the rest of the

decision, and the ALJ does not need to "spell[] out every consideration that went into the step

three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v.*

*Barnhart*, 165 F. Appx 408, 411 (6th Cir. 2006). The ALJ does not need to use a particular

format, and reviewing courts will read the decision "as a whole . . . to ensure there is sufficient

development of the record and explanation . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir.

2004) (noting that the ALJ does not need "to use particular language or adhere to a particular

format in conducting his analysis"). The claimant carries the burden of proof at step three and

therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if

the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F.

App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was

adequate where the claimant "presented essentially no medical evidence of a severe

impairment").

As the Sixth Circuit has stated, "When a claimant alleges that he meets or equals a listed

impairment, he must present specific medical findings that satisfy the various tests listed in the

description of the applicable impairment or present medical evidence which describes how the

impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th

Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must be viewed in light

of the evidence the claimant presents.

Plaintiff alleges that the ALJ erred in finding that her joint pain did not meet the listing requirements of Listed Impairments 1.02 or 14.09. (Doc. 13, at 18). She also alleges that the ALJ erred in finding that her depression does not meet the criteria of a Listed Impairment 12.04. The Court will address each of these arguments in turn.

### a.   Listing 1.02

Listing 1.02, which addresses major dysfunction of a joint, requires an initial finding of "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and *findings on appropriate medically acceptable imaging* of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, Apx. 1 § 1.02 (emphasis added). Plaintiff argues that the ALJ's finding that Plaintiff did not meet this criterion is not supported by substantial evidence. (Tr. 17; Doc. 13, at 18.)

The ALJ did not set forth the basis of her conclusion within Step Three of the decision; however as noted above, the ALJ's decision is reviewed as a whole. *See Bledsoe*, 165 F. App'x at 411; *Barnhart*, 364 F.3d at 505. In Step Four, the ALJ noted that "[t]here is no evidence the claimant has had any diagnostic imaging of her hands." Plaintiff does not rebut this conclusion in her brief or her reply brief. (*See* Docs. 13, 18.) Failure to submit a record that contains the requisite imaging studies precludes a finding that Plaintiff meets Listing 1.02. *See, e.g.*, *Saragino v. Colvin*, No. 12-138, 2015 U.S. Dist. LEXIS 134349, at *5-6 (D. Del. Sept. 30, 2015) ("The ALJ's conclusion that the record did not contain the requisite imaging studies . . . is supported by substantial evidence. . . . Therefore, the ALJ's conclusion that [the plaintiff's] medical condition did not meet or equal Listing 1.02(A) is not flawed.") (citation omitted);

24

*Forest v. Astrue*, No. 11-2017, 2012 WL 3437514, at *1 (E.D. La. Aug. 15, 2012), report and recommendation adopted, No. 11-2017, 2012 WL 3137844, at *12 (E.D. La. Aug. 1, 2012) ("The medical records contain evidence of decreased range of motion in plaintiff's right knee, but no medically acceptable imaging of joint space narrowing, bony destruction or ankyloses of that knee. Therefore, he does not meet the [] requirement of Listing 1.02. . . .").

Here, I find no evidence that Plaintiff submitted medically acceptable imaging of her hands and/or wrists. Thus the ALJ's finding that Plaintiff did not meet or equal listing 1.02 is supported by substantial evidence.

### b.    Listing 14.09

Plaintiff argues that the ALJ erred by failing "to address whether or not Plaintiff's conditions meet or equal the criteria of Listed Impairment 14.09 B or D." (Doc. 13, at 19.) Contrary to Plaintiff's assertion, the ALJ specifically considered the criteria for Listing 14.09, which deals with inflammatory arthritis, and found that "the record does not document" the requisite criteria. (Tr. 17.) The ALJ properly detailed her findings in Step Four of the decision. *See Bledsoe*, 165 F. Appx at 411; *Barnhart*, 364 F.3d at 505. For the reasons set forth below, substantial evidence supports the ALJ's conclusion that Plaintiff does not meet Listing 14.09.

Listing 14.09 B and D require the Plaintiff to show:

B. Inflammation or deformity in one or more major peripheral joints with:

> 1.  Involvement of two or more organs/body systems with one of the organs/body systems involved to at last a moderate level of severity; and

> 2.  At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

OR

D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (sever fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app 1, § 14.09B, D.

Plaintiff argues that she meets the requirements of Listing 14.09 B because she has bilateral inflammatory arthritis of the wrists and hands, with involvement of the musculoskeletal, immunologic, and hepatic systems, and severe fatigue, severe malaise, and weight loss. (Doc. 13, at 18-19.) As Defendant points out, Plaintiff does not specifically cite to medical records to support this claim. (*Id.*; Doc. 17, at 18.) However, in her reply brief Plaintiff does somewhat elaborate on her argument, including citations to medical records (Doc. 18.)

With regard to the inflammatory arthritis requirement, the ALJ found that "there is no evidence the claimant has arthritis of her hands." (Tr. 19; Doc. 13, at 18-19.) To refute this finding, Plaintiff initially relies on nurse practitioner Kish's diagnosis of rheumatoid arthritis and findings of swollen, hypertrophied joints. (Doc. 13, at 18-19; Doc. 18, at 2.)

As Defendant points out, a nurse practitioner is not a treating source. 20 C.F.R. § 404.1513(d) ("Other sources include, but are not limited to . . . nurse practitioners.") A nurse practitioner is not an acceptable medical source at all, and therefore her statements are not medical opinions. 20 C.F.R. §§ 404.1502, 416.902; (Tr. 26); SSR 06-3p, 2006 WL 2329939, at *2 ("[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical

opinion may be entitled to controlling weight.") An ALJ *may* use nurse practitioner opinions as evidence of the impairments' severity, and its impact on the claimant's ability to work. 20 C.F.R. § 404.1513(d). "[A]n ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners." *Cruse*, 502 F.3d at 540. However, an ALJ must provide "some basis" for rejecting a nurse practitioner's opinion. *Id.* at 541.

Here, the ALJ was not required to credit the opinion of Ms. Kish that Plaintiff had rheumatoid arthritis. *See* SSR 06-03p, 2006 SSR LEXIS 5 (S.S.A. Aug. 9, 2006) ("[I]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment."). The ALJ noted that she "considered opinion evidence in accordance with the requirements of CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 19.) She outlined Ms. Kish's findings and diagnosis, and although she did not discuss the weight assigned to those findings, she found that the conclusions of rheumatologist Dr. Manlapit, and medical consultant Dr. Sankaran contradicted Ms. Kish's diagnosis. (Tr. 19.) She also noted that Ms. Kish stopped treating Plaintiff for joint pain because of substance abuse. (*Id.*)The ALJ did not err by relying on the opinion of a rheumatologist, an expert in his field, over the opinion of a nurse practitioner. *See Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 652 (6th Cir. 2011) ("[W]hen the physician is a specialist with respect to the medical condition at issue . . . [the] opinion is given more weight than that of a non-specialist.") (citing 20 C.F.R. § 404.1527(d)(5)). Moreover, Dr. Manlapit's opinion was more consistent with the only other medical opinion on record that of Dr. Sankaran, which is another factor considered when weighing opinion evidence. 20 C.F.R. § 404.1527(d)(4). Finally, the ALJ did give some

credit to Ms. Kish's opinion as he gave Plaintiff "the benefit of the doubt in determining that her joint pain causes work related limitations." (Tr. 19.)

Plaintiff next argues that the ALJ misinterpreted the diagnosis of rheumatologist Dr. Manlapit. (Doc. 13, at 18-19; Doc. 18, at 3.) Although, Dr. Manlapit found Furlo exhibited "no distinct features of Rheumatoid Arthritis," Plaintiff asserts that his findings, which indicate an elevated sedimentation rate and C-Reactive Protein, a positive rheumatoid factor test, a positive cryoprecipitate screening, and a recorded history of joint pain and swelling, as well as his diagnosis of "Mild Mixed Cryogloblinemia associated with inflammatory type arthralgias and paresthesias," indicate that Dr. Manlapit agreed with Ms. Kish's rheumatoid arthritis diagnosis. (Doc. 13, at 18-19; Doc. 18, at 3; Tr. 261-62.)

In response Defendant cites to *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) as support for its assertion that it is not the ALJ's job to interpret raw medical data and make independent medical findings. (Doc. 17, at 11-12.) Thus, Defendant asserts that the ALJ did not err by accepting Dr. Manlapit's assessment that Plaintiff had "no distinct features of rheumatoid arthritis," bolstered as it was by Dr. Sankaran's findings. (*Id.* at 12.) In her reply, Plaintiff points out that "[n]owhere in the course of the [*Clifford*] decision does it address the ALJ's need to interpret raw medical data." Plaintiff also argues that the ALJ engaged in independent analysis when she assessed Dr. Manlapit's opinion. (Doc. 18, at 4, n.5.)

ALJ's are not permitted to play doctor and make their own medical findings. *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 194 (6th Cir. 2009) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Thus "while an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinion, the ALJ cannot substitute

his or her own lay medical opinion for that of a treating or examining doctor." *Wheeler v. Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 124286 (E.D. Mich. Aug. 14, 2015) (internal citations omitted). In *Clifford* a doctor found that the plaintiff suffered from degenerative knee arthritis, which severely limited her ability to walk or stand. 227 F.3d at 870. The ALJ gave little to no weight to this finding without citing to any contradictory medical reports or findings. *Id.* The ALJ also found that the plaintiff's activities were inconsistent with the doctor's opinion, but did not explain why. (*Id.*) In effect, the Court found that "the ALJ substituted his judgment for that of the [doctor]." (*Id.*)

In this case, the ALJ noted that Dr. Manlapit did not treat plaintiff and found "slight irritability in her wrists on extension[,] . . . no distinct features of rheumatoid arthritis and [that] her CCP antibody was negative." (Tr. 19.) The ALJ concluded that Dr. Manlapit found that the Furlo did not have arthritis. The ALJ did not discuss the positive rheumatoid factor or Dr. Manlapit's diagnosis of "Mild Mixed Cryogloblinemia associated with inflammatory type arthralgias and paresthesias." Plaintiff, without citing any support, asserts that this was error because the diagnosis in laymen's terms means rheumatoid arthritis and the test results support such a diagnosis. (Tr. 19; Doc. 13, at 18-19; Doc. 18, at 3.) By making this assertion, Plaintiff is engaging in the type of analysis found impermissible in *Clifford*. Plaintiff is interpreting the diagnosis of Dr. Manlapit, ignoring contradictory conclusions in his assessment, and concluding that Furlo has rheumatoid arthritis. Cryoglobulinemia is defined as "the presence of abnormal proteins in the blood [that] thicken in cold temperatures." *Cryoglobulinemia*, Medline Plus, https://www.nlm.nih.gov/medlineplus/ency/article/000540.htm (last updated Jan. 20, 2015). It is associated with several conditions including rheumatoid arthritis and

29

hepatitis C. *Id.* This does not support a conclusion that Dr. Manlapit diagnosed Plaintiff with rheumatoid arthritis, especially since he assessed her with "no distinct features of rheumatoid arthritis." (Tr. 261.) Furthermore, substantial evidence supports the ALJ's conclusion. The only evidence that in anyway contradicts the opinion of Dr. Manlapit is the prior diagnosis and notes of nurse practitioner Kish. However, Ms. Kish stopped treating Plaintiff for joint pain due to her substance abuse issues. (Tr. 288.) She only treated Plaintiff once subsequent to Plaintiff's consultation with the rheumatologist. Her notes indicate that Plaintiff has no current pain and do not mention any joint pain or swelling.[5] (Tr. 275-78.) Therefore, substantial evidence supports the ALJ's assessment of Dr. Manlapit's opinion.

Plaintiff also attacks, Dr. Sankaran's opinion alleging that is should be entitled to little if any weight. Plaintiff claims his findings are unreliable because  he failed to note swelling in her hands just nineteen days before nurse practitioner Kish noted manifestations of an inflammatory arthritic process, the examination took only ten minutes to perform, and he has a "40 year history of writing consultative medical reports both at the behest of Defendant and consistent with unfavorable decisions."[6] (Doc. 18, at 4; Doc. 13, at 22-23).

Plaintiff has not cited support for her allegations of bias and incompetence. The only support in the record is Plaintiff's testimony that the examination took only 10 minutes and

---

[5] Plaintiff notes in her reply brief that "[t]he more logical inference to draw here would be that having referred her out to a rheumatologist, NP Kish was no longer following Claimant's rheumatoid arthritis or that her other conditions had supplanted RA as the focus of Plaintiff's office visits." (Doc. 18, at 2 n.2). Looking at the record one could reach Plaintiff's conclusion; however one could also conclude that Ms. Kish stopped treating Plaintiff because Dr. Manlapit found she did not have rheumatoid arthritis. Under the substantial evidence standard, where substantial evidence supports the ALJ's decision it must be upheld, even if substantial evidence also supports the opposite conclusion. *Cutlip*, 25 F.3d at 286.

[6] In the Medical section of her brief, Plaintiff also notes that the results from the grip-strength test that Dr. Sankaran administered were not recorded, and she implies that the range of motion test results were too perfect, because they were not off by even a degree. (Doc. 13, at 11.) I suggest that Plaintiff waived this argument because it is fatally undeveloped. Kuhn v. Washtenaw Cnty., 709 F.3d 612, 624 (6th Cir. 2013) ("**Error! Main Document Only.**This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived.").

seemed "silly" because the doctor looked in her ear and said her liver is fine. (Tr. 50.) Yet, Plaintiff also testified that she could not recall the tests that Dr. Sankaran administered. Dr. Sankaran's opinion is not "thoroughly discredited by the findings of NP Kish, the laboratory testing and the examination results of Dr. Manlapit." (Doc. 13, at 22.) As previously discussed, the ALJ cannot interpret raw medical data, and reliance on Dr. Manlapit's interpretation that she did not have rheumatoid arthritis is supported by substantial evidence. *See Simpson*, 344 Fed. Appx. at 194. Ms. Kish's findings also do not directly contradict Dr. Sankaran's results. As Defendant points out she only noted swelling, hypertrophied joints on a few occasions. (Tr. 221, 224, 229; Doc. 17, at 24.) Moreover, Dr. Sankaran's notes are the only records indicating a grip strength test, a range of motion test in her hands and fingers, or the completion of tasks, such as opening a jar, buttoning clothing, writing legibly, picking up a coin and tying her shoe laces. (Tr. 210-13.) Thus, Plaintiff's bias and incompetence allegations are unfounded.

Even if the ALJ erred in finding that plaintiff did not have inflammatory arthritis, Plaintiff still does not meet the requirements of Listing 14.09 B because she has not established: (1) involvement of two or more organs/body systems; (2) involvement of one of the organs/body systems to at least a moderate level of severity; and (3) at least two constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). 20 C.F.R. pt. 404, subpt. P, app 1, § 14.09B. Plaintiff's argument that the hepatic, immunologic and musculoskeletal systems were involved, the last two to a moderate degree is conclusory and not supported by medical evidence. (Doc. 13, at 19.) Dr. Manlapit interpreted the medical data cited by plaintiff and found that she had mild mixed cryoglobulinemia "*without* any renal involvement, palpable pupura, or *hepatic involvement*." (Tr. 262 (emphasis

31

added).) Moreover, Defendant, accurately points out that Dr. Manlapit noted only "mild" abnormality and that Plaintiff "has no distinct features of Rheumatoid arthritis." (*Id.*) Thus it is unclear where Plaintiff derives her argument that the immunologic and musculoskeletal systems were involved to a moderate degree. Furthermore, Plaintiff does not address this argument in her reply brief. (Doc. 18.) Thus substantial evidence supports the ALJ's conclusion that Plaintiff does not meet the criteria of Listing 14.09 B.

Plaintiff also claims to meet the requirements of Listing 14.09 D because "she has repeated manifestations of inflammatory arthritis (pain and swelling on repeat visits NP Kish) with severe fatigue and malaise with marked manifestations of impairment in social functioning and in concentration, persistence and pace." (Doc. 13, at 19.) As previously discussed the ALJ finding that Plaintiff did not have inflammatory arthritis is supported by substantial evidence.

Even if Plaintiff did have inflammatory arthritis she does not meet the remaining criteria of 14.09 D. Plaintiff has not established two of the requisite constitutional symptoms—severe fatigue, fever, malaise, or involuntary weight loss. 20  C.F.R. pt. 404, subpt. P, app 1, § 14.09D. Once again Plaintiff asserts a conclusory argument that she meets this requirement without citing any evidence. (Doc. 13, at 19.) While she was diagnosed with acute generalized malaise by the emergency department, the Court is not convinced that a single diagnosis, without corroboration is sufficient to constitute a severe impairment. *See* Haney v. Astrue, No. CIV-11-412, 2013 U.S. Dist. LEXIS 47461, at *11 (E.D. Okla. Mar. 6, 2013). With regard to fatigue, Dr. Manlapit only noted "some fatiguability" and Plaintiff does not point to any medical evidence indicating she suffered from severe fatigue. (Tr. 241, 261.) There is also no

32

indication that Plaintiff suffered from severe involuntary weight loss. Plaintiff was diagnosed with a body mass index below adult on May 14, 2013. (Tr. 278.) However, she testified that she returned to her normal weight just three months later. (Tr. 33). Finally, there is no evidence of severe fever symptoms in the record.

### c.    Listing 12.04

As to Listing 12.04, the ALJ found that Plaintiff did not meet the listing criteria of "paragraph B," (Tr. 17-18.) which requires a showing of at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app 1, § 12.04B. "Marked" is defined in the regulations as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00C. The regulations further specify that marked is not defined by a specific number of tasks, social behaviors, or different activities "but by the nature and overall degree of interference with function." *Id.*

The ALJ found only a mild restriction in daily living activities; moderate difficulties in social functioning; moderate difficulties with concentration, persistence, and pace, and no episodes of decompensation. (Tr. 17-18.)

Plaintiff rejects the ALJ's analysis of Furlo's daily functioning under the criteria of paragraph B. (Doc. 13, at 19.) According to Plaintiff her "uncontradicted testimony" that she "mainly watches television and does nothing" establishes more than a mild restriction and this is not controverted by "the fact that she does her own laundry or occasionally venture[s] out." (Doc. 13, at 19.)

In considering daily activities the ALJ found that Plaintiff's function report shows that she does her laundry, watches television, talks to her children, pays the bills, can leave her home alone, and goes shopping. (Tr. 17-18.) The ALJ did not address why this supports a finding of mild restriction and not marked. However, as previously noted the regulations are clear that marked restriction is not determined by "a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function." 20 C.F.R. pt. 404, subpt. P, App. 1 , § 12.00C1. Thus Plaintiff's function report supports a finding that Furlo's limitations did not severely restrict her overall function.

Plaintiff raises similar arguments with regard to the ALJ's findings for social functioning and concentration, persistence and pace. (*Id.* at 19-20.) Once again Plaintiff does not provide any evidence in the record indicating a greater restriction than the moderate restriction found by the ALJ. She merely asserts that the ALJ improperly concluded that her difficulties were only moderate. (Doc. 13, at 19-20.) However, like daily functioning marked difficulties in social functioning and concentration, persistence, and pace are determined "by the nature and overall degree of interference with function," and not a specific number of social difficulties or concentration, persistence and pace difficulties. 20 C.F.R. pt. 404, subpt.

34

P, App. 1 , § 12.00C 2, 3. Plaintiff reported in her function report that she talks with family daily, goes out alone, and goes grocery shopping. (Tr. 151-53.) In addition, Dr. Menendes reported that her "social skills are adequate and she should be able to interact appropriately with others." (Tr. 208.) Thus substantial evidence supports the ALJ's finding of moderate difficulties in social functioning. In concentration, persistence, and pace, substantial evidence supports the ALJ's findings of moderate difficulties because the Plaintiff can watch TV, count change, pay bills, handle a savings account, and use a checkbook. (Tr. 144, 152-53.) Furthermore, Dr. Menendes found that she "likely has the capability to perform complex or multi-step tasks, make independent work related decisions, and engage in abstract thinking and work that is not routine." (Tr. 208.)

Plaintiff then argues that the ALJ erred by relying on Plaintiff's 2012 Function Report, which was completed over a year before the hearing, and was contradicted by Plaintiff's hearing testimony. (*Id.* at 19-20). Plaintiff does not cite to any support for the proposition that the completion date of her function report impacts its reliability or the ALJ's ability to use it. (Doc. 13, at 19-20.) Moreover, because the function report was completed subsequent to the alleged onset date of Plaintiff's disability it is certainly relevant here on the impact of her depression on the paragraph B criteria. *See Moore v. Colvin*, No. 4:13-CV-00600, 2014 U.S. Dist. LEXIS 130859, at *11 (N.D. Ala. Sept. 18, 2014). Plaintiff does raise a brief argument that her condition deteriorated subsequent to the completion of the function report, "as illustrated by the ER records and Dr. Menendes' report." (Doc. 13, at 20.) However, this argument is flawed because Dr. Menendes found that Plaintiff "is able to perform and remember concrete, repetitive, and tangible task such as activities of daily living." (Tr. 208.)

She also noted that Plaintiff's "social skills are adequate and she should be able to interact appropriately with others." (*Id.*)Thus it is unclear how Dr. Menendes' report contradicts the ALJ's findings. Finally, the ALJ considered Plaintiff's emergency room visits, in Step Four of her decision. (Tr. 20) The ALJ noted that Furlo started receiving treatment for her depression for the first time after her January visit. (*Id.*) She also noted Plaintiff's failure to seek additional treatment and found, as discussed later, that the plaintiff's testimony was "not fully credible." (*Id.*) Thus I suggest that the ALJ did not err in relying on Plaintiff's Function Report.

### 3.    *Whether Substantial Evidence Supports the RFC Assessment*

The ALJ found that Furlo had a Residual Functional Capacity ("RFC") to perform light work except that she must avoid extreme vibration, use of her upper extremities is limited to frequent, and she can perform only simple routine tasks with no public interaction and only occasional co-worker and supervisor interaction. (Tr. 18-19.)

Plaintiff argues that this conclusion is not supported by substantial evidence. With regard to physical limitations, Furlo alleges that the ALJ erred in relying on the findings of Dr. Sankaran, essentially reasserting her argument that he was biased and his findings were discredited by nurse practitioner Kish and Dr. Manlapit. (Doc. 13, at 21-22.) However, as previously discussed, the ALJ did not err by relying on Dr. Sankaran's opinion, thus I suggest that substantial evidence supports the ALJ's findings regarding physical limitations.

With regard to psychological limitations, Plaintiff claims that the ALJ erred by assigning more weight to the opinion of the non-examining state psychologist, Dr. Douglass than to the opinion of Dr. Menendes. (Doc. 13, at 23.)

36

Defendant asserts that an ALJ can assign greater weight to the opinion of a non-examining consultant when supported by the record. (Doc. 17, at 25-26) In support, Defendant cites to a Sixth circuit case which found that:

> a per se rule that the opinions of non-examining consultants cannot constitute substantial evidence when the reports are contradicted . . . by the opinions of examining but non treating consultants . . . is unsupported by case law . . . and is inconsistent with the agency's stated position, which is to treat non-examining consultants as experts. *See* 20 C.F.R. § 416.927(f); SSR 96-6p; 61 Fed. Reg. 34466 (1996).

*Id.* at 26 (citing *Fletcher v. Comm'r of Social Sec.*, 215 F.3d 1326, 2000 WL 687658, at *1 (6th Cir. 2000) (table)).

In her reply brief Plaintiff cites to *King v. Colven*, No. 14-cv-02322, 2015 U.S. Dist. LEXIS 53648 (N.D. Cal. Apr. 23, 2015), asserting that the court held that when comparing opinions of consultative examining sources and non-examining DDS sources the opinion of "the examining physician is entitled to greater weight than that of a non-examining physician." (Doc. 18, at 6.) Plaintiff further asserts that Dr. Menendes' opinion is more consistent with the medical record. (*Id.*)

Plaintiff is correct that examining physicians are *generally* entitled to more deference than non-examining physicians. *See* 20 C.F.R. § 404.1527; *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013); *McKnight v. Comm'r of Soc. Sec.*, No. 11-13376, 2012 WL 3966337, at *13 (E.D. Mich. Sept. 10, 2012) ("An examining physician's medical opinion is entitled to greater deference than a nonexamining source, such as the Department of Disability Service consultants."). However, as Defendant points out, "'in appropriate circumstances, opinions from state agency medical and psychological consultants . . .may be entitled to greater

weight than the opinions of treating or examining sources.'" *Brooks*, 531 F.App'x 642 (citing

SSR 96-6p, 1996 SSR LEXIS 3, at *7)).  Here the ALJ determined that Dr. Douglass, the non-

examining consultant was entitled to greater deference than the examining consultant because

Dr. Menendes "failed to full[y] assess the impact of the claimant's drug and alcohol use on her

mental impairment." (Tr. 21.) He further found that Dr. Douglass's opinion was consistent

with the medical evidence and the record as a whole. (Tr. 20-21.) Thus the ALJ cited adequate

reasons for giving greater weight to the opinion of Dr. Douglass. (Doc. 18, at 6.) Plaintiff

argues that Dr. Menendes' assessment is consistent with findings of the emergency department.

However, Plaintiff does not provide any citation to support this, and it is unclear to the Court

how emergency treatment necessitated by substance abuse, supports Dr. Menendes opinion,

when failure to address Plaintiff's substance abuse issues is the very reason the ALJ gave less

deference to her opinion.

Plaintiff also argues that by ignoring Dr. Menendes' report the ALJ "usurped" the

examining psychologist's role, which is a "perversion of the role of the ALJ." (Doc. 13, at 23.)

Plaintiff speculates that there is a

> trend here [where] the ALJ's accept the consultative examining psychologists
> findings, opinions and conclusions only when they support a denial decision, but
> when they support a finding of disabled, suddenly they are found, in those specific
> regards, as non-credible with the ALJ invariably then relying instead upon the
> non-examining bureaucrat whose job it is to rubberstamp denial, which is
> precisely what ALJ Turner did here.

(*Id.*) Defendant argues, that once again, the Plaintiff has provided no evidence for her claim of

ALJ bias. (Doc. 17, at 25.)

In evaluating a claim of bias the "court must begin with the presumption that [ALJ's] exercise their power with honesty and integrity." *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 363 (6th Cir. 2004) (internal quotations omitted). "The burden of overcoming the presumption of impartiality rests on the party making the assertion of bias, and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment is present." *Id.* at 364 (internal quotations omitted).

Here, Plaintiff clearly does not meet her burden. The claims of impartiality and prejudice raised throughout her brief and her reply are merely speculation.[7] The only evidence she supplies is the ALJ's deference to the opinion of a non-examining consultant over an examining one. However, as discussed above the ALJ did not err in this regard. Thus Plaintiff's claim that the ALJ was biased is unfounded.

Plaintiff raises a brief argument that the ALJ erred in her credibility assessment by ignoring Plaintiff's testimony that she lacked adequate insurance coverage. (Doc. 13, at 22.) However, "it is well-established that an ALJ may discount such testimony and such credibility determinations are entitled to great weight." *Locket v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 122877, 2012 WL 3759037 (E.D. Mich. Aug. 1, 2012); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Furthermore, the ability to afford treatment is just one of a variety of factors an ALJ considers in determining the claimant's credibility. *Id.*

Here the ALJ considered several factors in her credibility assessment. The ALJ acknowledged that Plaintiff lacked financial means and insurance coverage, but found that

---

[7] Plaintiff makes various allegations regarding the ALJ's impartiality throughout her reply. For instance, Plaintiff alleged at one point that "ALJ Turner may have had second thoughts of awarding Plaintiff benefits only to have the benefits squandered on her boyfriend, on alcohol, cigarettes and cocaine, [and that] if this was the true reason for her denial, she ought to have stepped up and admitted as much. . . ." (Doc. 13, at 22.)

Furlo was not "fully credible" because she did not seek low income health care options and spent funds on alcohol, cigarettes, and cocaine. (Tr 20.) The ALJ also considered the daily activities reported in Furlo's function report—doing laundry, shopping, going out alone, walking to family members' homes, and watching television—and found that they were not as limited as would be expected of someone with Plaintiff's alleged symptoms. (*Id.*) Thus I suggest that the ALJ did not err in her credibility assessment, and the RFC assessment is supported by substantial evidence.

> **4.    Whether The ALJ Erred in Finding Plaintiff Could Perform Past Relevant Work**

Here, Plaintiff first alleges that she met section 201.9 of the Medical Vocation Guidelines (the "grids") (Doc. 13, at 21.) Given Plaintiff's age, if she were limited to sedentary work, she would be disabled under Grid 201.9. 20 C.F.R. pt. 404, subpt. P, App 2 § 201.9. However the ALJ found Plaintiff could do light work with limitations. (Tr. 18-19). As discussed above this finding is supported by substantial evidence. Thus Grid 201.9 does not apply.

Next, Plaintiff argues that the ALJ erred in finding that her position as a housekeeper, cleaner was vocationally relevant. (Doc. 13, at 16.) She alleges that she only performed the job for two months and therefore the job did not qualify as substantial gainful activity because it was not performed for the requisite six months. (*Id.*)

Past relevant work is generally defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). "'Substantial gainful activity' is in turn defined as work that

40

involves 'significant physical or mental activities' done for 'pay or profit.'" *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395-96 (6th Cir. 2010) (citing 20 C.F.R. § 404.1574(a)-(b)). It is not clear, where Plaintiff derived her argument that a job must be performed for six months. As Defendant points out, she may be relying on the "Unsuccessful Work Attempt" rules. (Doc. 17, at 28 n.12.) However, these rules only apply if a claimant's impairment causes them to cease working or reducing the amount of work they perform. 20 C.F.R. § 416.974(c)(1). In this case, Plaintiff was fired from her position as a cleaner because of her husband's behavior; thus the unsuccessful work attempt rule does not apply. (Tr. 36.)

In *Wright-Hines*, the ALJ found claimant had past relevant work as a cashier even though she had worked only two to three months. 597 F.3d 392, 395. The court found that substantial evidence supported this finding even though the ALJ did not confirm the past work on the record because the claimant had notice prior to the hearing that the cashier position had been found as a past relevant occupation. *Id.* at 396.

In this case, Plaintiff's FICA earnings indicated that she earned almost $6,000 in 1988. (Tr. 125, 127, 131). The Social Security Administration's Disability Determination Explanation listed housekeeper from June 1998 to August 1998 as past work but found no past relevant work. (Tr. 35.) However, the ALJ did seek clarification on the record. (Tr. 35.) Although Plaintiff was unable to recall how long she worked, she testified that it was at least 35 hours a week and that "[i]t lasted a while." (Tr. 36.) Furthermore the VE specifically mentioned the cleaning position when he summarized Plaintiff's past jobs. (Tr. 59.) Plaintiff's counsel did not object or introduce evidence indicating that Plaintiff's position did not qualify

41

as substantial gainful activity. Thus substantial evidence supports the ALJ's finding that plaintiff had past relevant work as a cleaner.

Plaintiff next contends that the ALJ erred in finding that she could perform past relevant work because as performed the position was an exertion level of medium and the ALJ only found Plaintiff able to perform light work. (Doc. 13, at 16.) However, this argument is meritless. The ALJ specifically found that the Plaintiff could perform past, relevant work as a cleaner "as it is generally performed." (Tr. 22.) Under the DOT the position of cleaner is performed at the light exertional level. (DOT Code 323.687-014; Tr. 59.)

Moreover, even if Plaintiff could not perform past relevant work, the ALJ also found that a significant number of jobs exist in the national economy that Plaintiff could perform. (Tr. 22.) Specifically, the ALJ adopted the testimony of the VE that a person with plaintiffs impairments could perform the positions of collator operator, lining scrubber, and screen tacker. (Tr. 23.) Thus any error in Step Four was harmless and does not require remand. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

### G.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that White's Motion for Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 17) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1.) Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987.) Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 31, 2015                              S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge

## <u>CERTIFICATION</u>

  I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: October 31, 2015     By s/Kristen Krawczyk
             Case Manager to Magistrate Judge Morris